LEGAL SECURITY LIFE INSURANCE COMPANY, Appellant,

v.

UNITED STATES of America, Appellee.

No. 19396.

United States Court of Appeals Fifth Circuit.

May 2, 1962.

Douglas E. Bergman, Sylvan Tobolowsky, Dallas, Tex., for appellant.

Barefoot Sanders, U. S. Atty., Dallas, Tex., Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, David O. Walter, Burt J. Abrams, Michael A. Mulroney, Attys., Dept. of Justice, Washington, D. C., for appellee.

Before TUTTLE, Chief Judge, and HUTCHESON and WISDOM, Circuit Judges.

TUTTLE, Chief Judge.

The question raised by this appeal is whether liability for a documentary stamp tax arose as upon a "transfer * * * of rights to * * * receive" shares of stock in a corporation when Legal Security Life Insurance Company issued all of its outstanding capital stock on organization directly to the stockholders of Legal Reserve Insurance Trust in return for the transfer by Legal Reserve Insurance Trust of all of its assets representing the net amount resulting from the original investment in it by its stockholders.

Under the laws of Texas at the time, a new life insurance company authorized to issue no-par capital stock must have at least $250,000 paid in capital. Certain persons interested in organizing such a life insurance company desired to raise

sufficient funds in order to incorporate it. They undertook to do so by organizing on February 25, 1955, a separate corporation called Legal Reserve Insurance Trust (hereinafter referred to as Trust). The purpose was that stock would be sold in Trust in sufficient amount to provide it with funds, which would then enable it to organize the life insurance company with the required initial capital of at least $250,000. Shortly after the incorporation of Trust, its officers caused a prospectus to be issued which indicated its purpose. This prospectus contained the following language:

"The entire proceeds from the sale of the current offering will go directly into the treasury of the corporation and *will be available* to charter a full legal reserve life insurance company with a minimum capital of $250,000, and a surplus of $125,000, which is adequate for the successful operation of a multiple life insurance company.

"The corporation, upon completion of the sale of the current offering, by action of its Board of Directors, will be authorized to recall every share of outstanding stock in exchange for stock in the life insurance company. The basis for exchange will maintain the same proportion of ownership that each stockholder owns in the Legal Reserve Insurance Trust.

"On or about June 1, 1955, our 50,000 shares of Trust Company stock will have been sold, at which time the life insurance company will take over all assets of the Trust Company and thus the Trust Company will be dissolved. *Legal Re-*

*serve Insurance Trust will issue two (2) shares of non-par, non-assessable common voting stock in the insurance company in exchange for each share of outstanding stock held in Legal Reserve Insurance Trust on the date that the insurance company is chartered."* (Emphasis added.)

Similar representations were made by an open letter addressed to prospective stockholders of insurance Trust by the president of that corporation.

Although there is no showing in the record, which contains only the exhibits and a stipulation as to all of the facts deemed by the parties to be relevant to the inquiry, just what reliance was placed on these documents by the parties who actually bought stock in Trust, we may assume that investors in Trust acted upon the information contained in the prospectus and open letter.

The effort undertaken by Trust succeeded in that by July 22, 1955, Trust had accumulated sufficient funds to permit formation of a life insurance company. It thereupon transferred these funds to the newly incorporated Legal Security Life Insurance Company in return for its entire outstanding 344,000 shares of stock. These shares represented two shares for each share of outstanding stock in Trust. The shares were delivered by Life directly to the holders of Trust stock, and such holders were required to turn in their Trust stock for cancellation. Trust was later dissolved.

The contentions of the parties are simply stated: The government contends that under Section 4321 of the Internal Revenue Code of 1954 (26 U.S.C.A. § 4321),[1] the transfer by Trust of its as-

---

1. "§ 4321. Imposition of tax.

"There shall be imposed a tax on each sale or transfer of shares or certificates of stock, or of rights to subscribe for or to receive such shares or certificates, issued by a corporation, at the following rates:

&ast; &ast; &ast; &ast; &ast;

"(2) No-par-value stock.—Five cents on each share, except as provided in paragraph (3)."

"§ 4351. Definitions.

&ast; &ast; &ast; &ast; &ast;

"(b) Sale or Transfer.—For the purpose of this subchapter, the term 'sale or transfer' means any sale, agreement to sell, memorandum of sale or delivery, or transfer of legal title, whether or not shown by the books of the corporation or other organization (or by any assignment in blank, or by any delivery, or by any paper or agreement or memorandum or other evidence of transfer or sale); and whether or not the holder acquires a beneficial interest in the instruments." 26 U.S.C.A. §§ 4321, 4351.

sets to the Life insurance company in return for the issuance by the Life insurance company to Trust stockholders of all of its outstanding stock constituted two taxable transactions: First, an original issue of the Life insurance company's stock on which an issue tax was due, and, second, the transfer by Trust to its stockholders of its right to receive the shares. The taxpayer, on the other hand, contends that the only tax due was the original issue tax, which has been paid; that the delivery of the stock to the stockholders of Trust did not result from a transfer by Trust of its right to receive the stock, but arose because the stockholders by initially investing in Trust intended, and had a right, to require that Trust transfer the funds to the Life insurance company in return for its issue of its original stock directly to the stockholders.

We conclude that the trial court rightly determined that there was a taxable transfer when the Trust company transferred its assets to the Life insurance company and directed the Life insurance company to issue the stock to the Trust company's stockholders rather than to it.

For some reason, doubtless adequate to themselves, the parties involved decided that in order to accumulate sufficient funds to organize the Life insurance company, they would first organize a corporation whose function it would be to seek out the funds of investors interested in a like purpose and cause them to buy shares of stock in this corporation with an understanding that when the funds were obtained in a sufficient amount, these funds would "be available to charter a full Legal Reserve Life Insurance Company." This was the language of the prospectus upon which the taxpayer relies to demonstrate that the transfer by the Trust company of the net amount received from the sale of its stock was in effect payment by the Trust company's stockholders directly into the treasury of the newly organized Life insurance company.

The prospective investors in the Life insurance company need not have organized a separate corporation at all. If they had had sufficient confidence in the promoters they could have been asked to turn their money over to these individuals to hold for them until the required $250,000 had been accumulated, with the understanding that the promoters were to hold it merely as their agents until sufficient funds had been accumulated, whereupon the investors who had supplied the funds would then be able to invest them directly in the new insurance company. Under such circumstances, of course, there would be no transfer tax due because the shares would be received from the Life insurance company by the persons who had actually paid for them. Here, however, that is not what was done. The ultimate investors in the Life insurance company first bought stock in the Trust company. The Trust company, in accordance with the understanding of all parties, accumulated these funds over and above the expenses of maintaining the operation, and, by proper corporate action, voted to transfer them to permit the incorporation of the new Life insurance company.

As said by the United States Supreme Court in Raybestos-Manhattan Co. v. United States, 296 U.S. 60, at page 63, 56 S.Ct. 63 at page 65, 80 L.Ed. 44:

"* * * the generating source of the right to receive the newly issued shares of petitioner was the conveyance to it of the property of each of the corporations to be consolidated. The new shares could not lawfully be issued to any other than the grantor corporation without its authority * * *."

There was clearly a business purpose for the interposition of this corporation between the investors and the yet-to-be organized Life insurance company. That being the case it is not proper for the court to disregard the intervening corporation as an entity in the several transactions. See Moline Properties v. C. I. R., 319 U.S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499. As such entity, of course, under familiar principles of law, it held some $270,000 paid in by its stockholders,.

probably under strong moral, if not absolute legal, obligations to vote a transfer of those funds into the organization of a new Life insurance company. In return for the transfer of such funds, it, of course, under equally familiar legal principles, became entitled to receive the outstanding stock in the new corporation. It also doubtless had the power to authorize the Life insurance company to issue these shares to its stockholders rather than causing them to be issued to it first. As stated by the Supreme Court in the Raybestos-Manhattan Co. case, supra, "here the power to command the disposition of the shares included the right to receive them and the exercise of the power which transferred the right is subject to the tax," (296 U.S. page 64, 56 S.Ct. page 65).

Without attempting to determine what the liabilities of the parties would be if the original investors had merely appointed an escrow agent with directions to hold these funds and use them to organize a new insurance company, or if the original investors had created a trust under a trust indenture, which itself prescribed the exact disposition of the funds for the benefit of the original investors, we simply note that this is not what happened in this case. It is entirely consistent with everything that was represented in the open letter and the prospectus for the Trust company to do what, absent a transfer tax liability, would normally have been done—that is, to have transferred the funds to the new Life insurance company and to have received the 344,000 shares of its stock and thereafter to have transferred these shares to its own stockholders as a transfer upon its dissolution. This, in fact, appears to have been contemplated by the part of the prospectus that said "Legal Reserve Insurance Trust will issue two (2) shares of non-par, non-assessable common voting stock in the insurance company in exchange for each share of outstanding stock held in * * * Trust on the date that the insurance company is chartered."

We conclude that the trial court correctly determined that Legal Reserve Insurance Trust, a separate corporate entity, upon the transfer of its assets to the newly organized Life insurance company became entitled to all of the stock in that company, and that its transfer of that right by requiring that the shares of stock be issued not to it but to its stockholders, was such transfer as brought it within the terms of Section 4321 of the Internal Revenue Code.

The judgment is

Affirmed.